**MEDI–TRUST REINSURANCE CO., LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–559T.**

United States Court of Federal Claims.

March 14, 1997.

---

Michael I. Saltzman, New York City, for plaintiff.

Karen L. Moss, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

## ORDER

MILLER, Judge.

This case is before the court after argument on plaintiff's motion for summary judgment. The issue to be resolved is whether Medi–Trust Reinsurance Co., Ltd. ("plaintiff" or "Medi Trust Re"), signed, or had an authorized agent sign, insurance policies in a state in which it was authorized to do business, thus falling within the exemption to the excise tax, 26 U.S.C. (I.R.C.) § 4373 (1982), and making itself liable for income tax pursuant to 26 U.S.C. (I.R.C.) § 842 (1982).

### FACTS

Plaintiff's claim for a refund of excise taxes primarily depends on whether Medi–Trust Re was authorized to do business in the Commonwealth of Kentucky ("Kentucky"). Thus, the material facts are those reflecting the nature and extent of its activities as an insurer in the state. The following facts are undisputed, unless otherwise noted. In June 1982 Davinder S. Sahni and Michael O'Leary purchased Emergency Medical Services ("EMS"), a subsidiary of Humana, Inc. EMS, headquartered in the Dupont Circle Professional Towers, Louisville, Kentucky ("Louisville"), provided emergency medical services to health care facilities in several different states. After purchasing EMS, Mr. Sahni and Dr. O'Leary contracted with J. Dennis Watts & Company, Inc. ("Watts"), to provide assistance in obtaining medical malpractice insurance. With the assistance of

Watts, EMS obtained medical malpractice insurance from two separate insurers.

Plaintiff contends that in 1984 an emergency medical malpractice insurance crisis occurred in the United States. As a result of this crisis, as to which no dispute exists as of 1985, one of EMS's insurers went out of business and the other ceased to insure emergency medical physicians. Watts suggested that if EMS were to join together with other emergency medical service providers to form an association, such an entity might find it easier to obtain medical malpractice insurance. The rationale for forming the association was that by combining and agreeing to assume a portion of the risk of a malpractice suit, the association would be viewed as a desirable client and would be able to obtain favorable premium rates.

Sometime during 1984, Watts' suggestion was put into practice when EMS and approximately 12 other emergency medical service providers joined together to form the Medi–Trust Association (the "Association").[1] In accordance with Watt's suggestions, at a December 1984 meeting, the Association members established certain membership criteria. The purpose of the criteria was to demonstrate to potential insurers that all Association members were a good risk, certainly below that of the average emergency medical physician. To further reduce a potential insurer's risk, each member of the Association agreed to be responsible for the initial $10,000.00 of a claim, and the Association itself agreed to assume the risk of the subsequent $90,000.00. Accordingly, a potential insurer would only be responsible for claims in excess of $100,000.00.

Apparently, the Association successfully obtained insurance from Transport Indemnity Company. Transport Indemnity, however, informed the Association in April 1985, that effective July 15, 1985, it was canceling the existing insurance policy. The Association thus was obligated to investigate other means of obtaining necessary insurance coverage. Moreover, the Association was under considerable time pressure to obtain coverage before the Transport Indemnity policy expired on July 15. One obvious potential source of medical malpractice insurance investigated by the Association was existing insurers. The parties dispute whether, as plaintiff contends, the existing insurance market was unavailable to the Association.

The second alternative that the Association considered was the formation of its own insurance company. Defendant contends that the Association had been considering the formation of its own insurance company as early as mid–1984 and never seriously considered the possibility of obtaining insurance through an existing insurer. Nevertheless, to assist in its investigation of this option, the Association retained Tillinghast, Nelson & Warren, an international insurance consulting firm, who suggested that the Association consider forming an offshore captive insurance company. After investigating several potential offshore locations, the Association chose to establish a captive insurance company in the Turks and Caicos Islands because those islands had no insurance regulations, thereby making establishment of an insurance company a relatively simple matter.[2] The resulting firm, established in July 1985, was known as Medi–Trust Reinsurance Co., Ltd., plaintiff in this action.

Plaintiff asserts that Medi–Trust Re neither applied for authority to do business in any state, nor was it ever authorized to do business in any state during the years pertinent to this action. Moreover, plaintiff further contends that Medi–Trust Re could not have been authorized to do business in Kentucky because it was unable to comply with the capital requirements demanded by Kentucky insurance regulations. Furthermore, plaintiff maintains that its operating procedures were designed to avoid the establishment of any contacts with the United States

1. The actual date on which the Medi–Trust Association was formed is in dispute. Plaintiff alleges that the association was formed in December 1984. Defendant, however, contends that the association was formed at least five months earlier.

2. As the Association's existing insurance coverage was to terminate on July 15, 1985, time was of the essence. Plaintiff therefore abandoned its initial effort to establish a captive offshore insurer in the Cayman Islands.

in general and Kentucky in particular. Plaintiff's success, or lack thereof, in complying with that intent is the point at which the parties' interpretation of the events leading up to this action diverge.

On October 17, 1985, plaintiff entered into a management agreement with Bott & Associates, Ltd. ("Bott"), an insurance management company located in Bermuda. One of the primary purposes of this agreement was to arrange for Bott to sign or countersign Medi–Trust Re's policies in Bermuda. According to plaintiff, in the vast majority of cases this intent was carried out, and most policies were signed or countersigned in Bermuda. Plaintiff concedes that on certain occasions insurance binders and certificates may have been signed in Kentucky. Plaintiff caveats, however, that these documents are not policies and consequently may be signed within the United States.

Defendant contends that the management agreement signed on behalf of plaintiff by Dr. O'Leary was invalid because Dr. O'Leary lacked signatory authority. Moreover, defendant argues that Bott did not take part in plaintiff's operations until 1986. Defendant asserts that prior to Bott's involvement, plaintiff's policies were signed in Kentucky. Moreover, defendant contends that policies continued to be signed in Kentucky even after Bott became involved.

Under the terms of the management agreement, Bott's other duties entailed preparing an annual statistical report, providing advice on insurance industry customs and practices, processing claims data, maintaining claims records, maintaining books and records, preparing quarterly financial reports, and handling all filings required by the Turks and Caicos Islands. Defendant contends that Bott did nothing more than sign policies and send them to insureds; all underwriting, accounting, and assisting with policies were performed in Kentucky.

In addition to the management agreement, plaintiff also entered into a Claims Service agreement with Watts on July 31, 1985. Under the terms of this agreement, Watts was to

a. receive information from insured regarding claims;

b. gather facts concerning the merits of claims;

c. engage legal counsel, subject to Medi–Trust Re's approval;

d. present settlement options to Medi–Trust Re; and

e. advise Medi–Trust Re and the insured on claims management.

See Declaration of J. Dennis Watts (undated). ¶ 18. The Claims Service Agreement did not permit Watts

a. to sell, or appear to have the authority to sell insurance offered by Medi–Trust Re;

b. to settle claims or authorize payment in settlement of claims without the express written consent of Medi–Trust Re; or

c. to accept insurance premiums except in fiduciary capacity for immediate forwarding to Medi–Trust Re.

Id. ¶ 22. Furthermore, Watts avers that he was forbidden from taking any action that would lead insureds to assume that plaintiff was a licensed insurance company in the United States or that Watts was plaintiff's licensed agent.[3] See id.

As further evidence that it was not authorized to do business in any state, plaintiff sets forth several arguments. First, Medi–Trust Re undertook no efforts whatsoever to solicit customers in the United States. Second, Medi–Trust Re neither advertised nor employed an agent to solicit business in the United States. Third, Medi–Trust Re did not have an office within the United States, was not listed in any United States telephone directory, and had no employees in the United States. Fourth, when the occasion arose for plaintiff to acquire reinsurance, it did so via international markets.

Defendant counters by noting that Dr. O'Leary and Mr. Watts sought to entice individuals to join the Association so as to be eligible for insurance through Medi–Trust

---

**3.** Defendant asserts that the entire claims service agreement was invalid because it was never executed.

Re. Defendant further contends that Medi–Trust Re operated primarily out of Mr. Sahni's offices located first at the Dupont Circle address and later at Wessex Place in Louisville. Moreover, Mr. Sahni's employees allegedly performed work on behalf of Medi–Trust Re even though they were never issued a Form W–2 or a Form 1099. Finally, correspondence addressed to Medi–Trust Re, as well as premium payments, were sent to post office box addresses in Louisville.

With respect to bank accounts, plaintiff asserts that Medi–Trust Re's principal bank accounts were first with Southeast Bank of Miami, Florida, and subsequently with Citizens Fidelity Bank of Louisville, Kentucky. These accounts consisted of a depository account and an operating account. Mr. Sahni was signatory for the depository account and Mr. Bott, for the operating account. Funds in the depository account were invested daily outside the United States in Eurodollar deposits. Defendant contends that these transfers were performed by an employee of Mr. Sahni operating from Mr. Sahni's Louisville office.

The most significant area of dispute centers around plaintiff's relationships with two domestic insurers. Several hospitals required their emergency medical physicians to have medical malpractice insurance issued by an authorized domestic insurer. Plaintiff therefore entered into an agreement with Lexington Insurance Company ("Lexington"), an eligible surplus lines carrier[4] to roll what had been Medi–Trust Re policies into those issued by Lexington. Defendant has suggested that when the Kentucky Department of Insurance (the "Department") learned that Medi–Trust Re was engaging in the insurance business inside Kentucky, the Department requested that Medi–Trust Re affiliate itself with an authorized insurance provider.

Regardless of the impetus for the agreement, after its enactment, Lexington provided coverage to members of the association with policy limits of $1 million per claim/$1 million annual aggregate. Despite the issuance of these policies, Lexington bore no risk due to a security trust agreement under which plaintiff provided $1 million as security to reimburse Lexington for payments made to insureds. Plaintiff also agreed to pay any amounts in excess of the $1 million policy limit. Consequently, defendant categorizes the relationship between plaintiff and Lexington as one in which Lexington merely acted as a fronting company for plaintiff.

When the agreement with Lexington concluded in July of 1987, defendant asserts that Sona International, Inc., the holding company controlling plaintiff, purchased the shell of an Indiana insurance company, which became known as Paradigm Insurance Company ("Paradigm"). According to defendant, plaintiff used $3 million in allegedly untaxed Medi–Trust Re insurance premiums to provide Paradigm with sufficient capital to comply with the State of Indiana's insurance regulations, thus enabling it to qualify as a licensed insurance carrier in that state. After the acquisition of Paradigm, members of the Association were insured through Paradigm wherever Paradigm was authorized to do business as either an admitted carrier or as an authorized surplus lines insurer. Plaintiff asserts that after Paradigm was capitalized, Medi Trust Re was in a "run off" status which plaintiff characterizes as essentially a winding down of operations in favor of Paradigm.

Under the impression that it was a foreign insurer, not authorized to conduct insurance business in any state, Medi–Trust Re paid to the Internal Revenue Service (the "IRS") excise tax pursuant to 26 U.S.C. ("I.R.C.") § 4371 (1982), based on gross premiums received. The IRS however sought to impose income tax on plaintiff pursuant to I.R.C. § 842. Having paid income tax for tax year 1985, plaintiff now asserts that the income tax was imposed erroneously and seeks a refund of $597,820.00 representing the amount of income tax paid for that tax year. In the alternative plaintiff claims judgment

---

4. A surplus lines carrier is not authorized to do business in Kentucky. Rather, a surplus lines carrier provides a type of insurance coverage not available through firms licensed to do business in Kentucky. Because medical malpractice insurance was difficult to procure during the crisis, Kentucky authorized surplus lines carriers in that area. Lexington is such a carrier.

in the amount of $597,820.00 representing the amount of excise tax, interest, and statutory interest paid. Additionally, plaintiff seeks judgment in the amount of $8,365.92 representing an excise tax penalty previously paid. Defendant has counterclaimed for income tax due in tax years 1985, 1986, and 1987 totaling $3,797,366.00, as well as excise tax due for tax year 1988 in the amount of $27,585.40.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Summary judgment is not appropriate if there are disputes over material facts that might significantly affect the outcome of a suit. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The initial responsibility rests with the movant to establish the absence of any disputes over material facts. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

To defeat a motion for summary judgment, the opponent bears the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. When resolving a motion for summary judgment, the court may not weigh the evidence and seek to determine the truth of the matter. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Moreover, any evidence presented by the opponent should be believed, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513–14. A trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Id.*

■ As both this court and the Federal Circuit noted in *Neptune Mutual Assoc., Ltd. of Bermuda v. United States,* 13 Cl.Ct. 309 (1987), *aff'd in part and vacated in part,* 862 F.2d 1546 (Fed.Cir.1988), an offshore insurer

cannot be liable for both the excise tax and the income tax. Accordingly, the court will look first to the excise tax. Only if the offshore insurer is exempt from the excise tax, will it be liable for the income tax.

■ Under I.R.C. § 4373(1), an insurer will not be subject to the excise tax with respect to "[a]ny policy ... signed or countersigned by an officer or agent of the insurer in a State, or in the District of Columbia, within which such insurer is authorized to do business."[5] Consequently, to pay income tax, as opposed to excise tax, an offshore insurer must 1) be authorized to engage in the insurance business in a particular state and 2) sign policies in that same state. Plaintiff argues that as Medi–Trust Re was never granted a certificate of authority authorizing it to engage in the insurance business in Kentucky, it fails to meet the first prong of I.R.C. § 4373(1) and therefore is liable for the excise tax. According to plaintiff, under the rule established by *Neptune Mutual,* the absence of express authorization in compliance with applicable state law is dispositive.

With respect to the period from the formation of Medi–Trust Re through July 15, 1986, plaintiff has established that it does not satisfy the exemption criteria of I.R.C. § 4373(1) because it was not authorized to do business in a state. In *Neptune Mutual* an offshore insurer asserted that it met the requirements of I.R.C. § 4371(1) and therefore was exempt from the excise tax. The crux of the taxpayer's argument in *Neptune Mutual* was that tacit permission or acquiescence to engage in the insurance business by the applicable state licensing agency constituted authorization. Under the taxpayer's theory, formal authorization was not required.

■ Both this court and the Federal Circuit disagreed with the taxpayer's characterization of the excise tax exemption. Accordingly, a foreign insurer must have formal authorization via either a certificate of authority or other means of compliance with state insurance regulations to avoid paying

---

**5.** The intent of the excise tax is to create an incentive for offshore insurers to subject themselves to laws and regulations of the state in which they are doing business. In the instant case, for reasons unknown to the court, plaintiff prefers to pay the excise tax.

the excise tax. A "weary shrug of the shoulders ... does violence to the plain meaning of 'authorize.'" *Neptune Mutual Assoc.*, 862 F.2d at 1553.

In the instant case, from the time of its formation in 1985 through July 15, 1986, when the agreement with Lexington went into effect, Medi Trust Re was acting in a manner similar to that of the taxpayer in *Neptune Mutual.* Pursuant to the Kentucky insurance laws and regulations, it is unlawful for a company to engage in the insurance business inside Kentucky without having a certificate of authority. Kentucky Insurance Laws & Regulations, § 304.11–030 (1994). The two pertinent exceptions cover the lawful transaction of either surplus lines insurance or reinsurance. *Id.*

No dispute is present regarding the fact that Medi–Trust Re did not hold a certificate of authority permitting it to engage in the insurance business. Moreover, neither party suggests that, from its inception in 1985 through July 15, 1986, Medi–Trust Re was either an eligible surplus lines carrier or a lawful reinsurer. Plaintiff therefore was not authorized to engage in the insurance business for this period.

The lack of express authorization in compliance with pertinent state law serves to preclude application of the excise tax exemption. *Neptune Mutual Assoc.*, 862 F.2d at 1554. Plaintiff's failure to meet the first prong of § 4373(1) obviates the necessity to make a finding whether policies were signed in Kentucky during this period. Plaintiff's motion for summary judgment is granted with respect to the period commencing with the formation of Medi–Trust Re through July 15, 1986.

■ Defendant, however, has raised sufficient issues of material fact for the remaining tax years in question. Having become aware of plaintiff's activities within its jurisdiction, the Department initiated an investigation that sought to determine the extent and scope of plaintiff's operation. As a result of this investigation, the Department informed plaintiff that in order to continue to operate in Kentucky, Medi–Trust Re must affiliate itself with an authorized insurer. The agreements with Lexington and Paradigm resulted.

With respect to these relationships, defendant has categorized them as mere "fronting" arrangements. The intent, according to defendant, was to create a subterfuge that would satisfy the Department and permit Medi–Trust Re to operate in Kentucky while continuing to avoid the income tax. After numerous rounds of briefing, as well as oral argument, the court is not persuaded as to the absence of any disputed material facts surrounding these relationships. Both parties have submitted declarations, interviews, and arguments in support of their respective positions. Defendant, as the party opposing summary judgment, is entitled to the benefit of "all applicable presumptions, inferences, and intendments...." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed. Cir.1984). Consequently, the court may not weigh the proffered evidence and declare defendant's position completely devoid of evidentiary support. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

The next significant area of dispute concerns the alleged signing of policies in Kentucky from July 15, 1986, onward. Plaintiff has conceded that even after the agreement with Bott went into effect, a limited number of policies continued to be signed in Kentucky. Neither party has presented conclusive evidence as to the actual number of policies that were signed in Kentucky or the dates on which policies may have been signed. Moreover, whether actual policies were signed in Kentucky or whether merely certificates or binders of insurance were signed remains in doubt. Resolution of these issues can only be determined by trial.

These factual disputes go directly to the heart of plaintiff's claim that it is liable for the excise tax. While plaintiff has made a strong showing in support of its claim, the complex nature of the financial relationships at issue in this particular case precludes the court from resolving the timeframe from July 15, 1986, onward without trial.[6] Accordingly,

---

**6.** The court is cognizant of the well-settled principle that Congress has ceded the realm of insur-

**IT IS ORDERED,** as follows:

1. Plaintiff's motion for summary judgment is granted with respect to tax year 1985 and tax year 1986 through July 15, 1986.

2. Plaintiff's motion is denied with respect to tax year 1986 from July 15 onward, tax year 1987, and tax year 1988.

3. The parties have requested 60 days from the date of this decision to explore their options. The parties shall file a Joint Status Report by May 14, 1997, proposing dates for the meeting of counsel, pretrial filings, pretrial conference, and trial.

ance regulation to the several states. *See, e.g.,* 15 U.S.C. § 1011 (1994). This order does not seek to interpose a federal definition of what constitutes authorization to engage in the insurance business in Kentucky. Kentucky granted express authorization to Lexington and Paradigm. Defendant did not raise as a disputed genuine issue of material fact whether Medi–Trust Re received all the premiums for the insurance policies written by Lexington and Paradigm, and plaintiff maintains that Medi–Trust Re only held the runoff of old policies. If plaintiff can establish the limited insurance business that it conducted truly was apart from Lexington and Paradigm or that Medi–Trust Re policies were not signed in the United States, plaintiff will be correct that, under the holding of *Neptune Mutual,* its unauthorized activities will render it liable for excise tax.